## GINDORFF v. PRINCE.

No. 233, Docket 21726.

United States Court of Appeals Second Circuit.

Argued April 5, 1951.

Decided June 4, 1951.

William M. Chadbourne, of New York City (Allen G. Miller, C. Dana Fearon, Jr., and Richard W. Dearborn, all of New York City, on the brief), for plaintiff.

Paul Windels, of New York City (Wickes, Riddell, Bloomer, Jacobi & McGuire and Harold F. McGuire and Stanley A. Freedman, all of New York City, on the brief), for defendant.

Before L. HAND, AUGUSTUS N. HAND and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Defendant appeals from a judgment awarding the plaintiff $38,100 for services rendered as his financial adviser over a ten-year period. While the plaintiff had made claim on a special contract for his personal and business advancement in return for service as financial adviser, the court found this too vague to be enforceable, but then gave judgment for the reasonable value of the services. Defendant contests the nature and extent of the services claimed and says specifically that he

did not contract for any services whatever —an issue of veracity which the trial court has resolved in the plaintiff's favor. Plaintiff has cross-appealed for an increase of damages to $187,000. While certain issues of law do arise, the fundamental question is whether, upon the testimony adduced, the findings of the court in the plaintiff's favor are to be held "clearly erroneous" under Fed.Rules Civ.Proc. rule 52(a), 28 U.S.C.A. We are constrained to decide that they are and that the judgment must be reversed for dismissal of the action.

We are under no illusion as to the serious concern, under our own decisions as well as others, with which we must approach the step of reversing a trial judge on issues so dependent upon veracity. Nevertheless our ultimate responsibility is clear under the Rule itself and has been restated by the Supreme Court, notably in United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, where the Court went on to say: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." This court has that definite and firm conviction.

As will be more fully developed below, plaintiff presents a new version of the Cinderella story, based entirely on his own testimony (and squarely contradicted by defendant), that he, a $62-a-week statistical clerk in an investment house, was employed on rather short acquaintance by this aged multimillionaire railroad magnate to take over direction of the latter's vast financial empire as an out-of-hours activity while he continued his ordinary employment. So great are the opportunities of America that this conceivably might happen, although the circumstances would suggest careful scrutiny before his story is accepted in full. Here such scrutiny seems to us fatal to its believability. There are too many incongruous details and circumstances, shown both affirmatively and negatively, from contemporaneous documents and conduct, to leave us other than utterly incredulous. The trial judge himself was skeptical, even contemptuous, throughout the plaintiff's testimony; he seems to have come around through even greater question of the defendant and particularly the latter's motives, as noted below. Perhaps in consequence of this sequence, there are inconsistencies in the findings which are difficult of reconciliation, even on the theory adopted below. But since we are placing decision upon broader grounds, we shall first turn to a detailed consideration of what the record discloses as to the relationship between these two men, the parties to this litigation.

The actual beginning of the story is on April 23, 1935, when, as plaintiff says, he called on the defendant, then just returned from Europe, at the latter's hotel suite in New York City and they entered into an oral agreement in the course of the conversation between them. Defendant was then 75 years of age; he was 89 at the time of the trial. His long experience in the ownership and management of railroad properties and his vast holdings, estimated to be in excess of $80,000,000, were fully developed in the record. We need not rehearse them here; many are in fact described in Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 694–697, 63 S.Ct. 843, 87 L.Ed. 1086, reversing Chicago Stock Yards Co. v. Commissioner of Internal Revenue, 1 Cir., 129 F.2d 937, which involved a tax liability in itself of several millions. The plaintiff had then been in the employ of J. P. Morgan & Company for about ten years, having gone with this firm to learn the banking business when he graduated from Harvard in 1925. He had been assigned to its railroad department in 1928 and had made statistical studies of various railroads. He had no title and received an annual salary of $3,240 during the years 1933–1935. He met defendant rather casually in 1933 through a friend, John W. Barriger, a railroad statistician. The latter was working on the "Prince Plan," a plan for the consolidation of railroads submitted by defendant to President Roosevelt. Plaintiff says he assisted Barriger without charge and out of friendship. In this way he was introduced to defendant by Barriger and thereafter accompanied the latter on various visits to

the defendant's hotel suite. Defendant appears to have been quite a talker, particularly on railroad subjects, and plaintiff a rather good listener. At any rate, each seems to have had considerable opportunity to exercise his specialty, for then began the friendly relations which admittedly existed until the split in November, 1945.

From plaintiff's testimony as to the conversation of April 23, 1935—the defendant denied that any such conversation occurred —it appeared that the defendant talked at some length, saying that he desired to be relieved of his burdens, that he and his staff were getting older, that he had been disappointed in his son and in his secretary, McDonough, and that he was looking for the right man to take on the responsibilities for his whole transportation system or empire. So he asked if plaintiff would go out to Chicago and work along with the staff there to study the yards, the railway, the problems, and learn all about them; and when plaintiff agreed he said, "if I do that he will make me an officer and director of those companies," mentioning "the Chicago Junction Railway, the Chicago Stock Yards Company, the Chicago Junction Railways and Union Stock Yards Company, and F. H. Prince & Company, Inc." And then he said, "Now, in addition, Mrs. Prince or I are planning to resign—to get off—to resign from the trust, and I will appoint you to the vacancy when it occurs." Plaintiff went on to explain that this had reference to the living trust in which were lodged all the shares of F. H. Prince & Co., Inc. Plaintiff also testified that "at one point in this conversation he asked me if I would go out to Chicago and take charge, know all about these companies and his problems, and to step in to take charge, and that that was what he wanted me for." Plaintiff asked defendant when he would make these changes and was told defendant planned to make them before returning to Europe that summer; he wanted to make arrangements for the retirement of the men in Chicago who had been with him for many years. Meanwhile plaintiff was to remain at Morgan's to study defendant's problems and confer with him, and defendant would place a mil-lion dollar deposit at Morgan's to help plaintiff's prestige.

This is the agreement as eventually stated by plaintiff. We may look also at his earlier statements in his pleadings and pre-trial examination. In his original verified complaint in the Supreme Court of New York—defendant removed the action to the district court because of the diverse citizenship of the parties—plaintiff relied on two "causes of action": one for services performed at defendant's special instance and request as "a personal consultant and financial adviser" from April, 1935, to November 10, 1945, "of the reasonable value of at least $250,000.00"; and the other for breach of a contract of April, 1935, to act as "personal consultant and financial adviser," in consideration for which "defendant agreed to cause plaintiff to be elected a director of F. H. Prince & Co. Inc.," a Maine corporation, and "to appoint him a co-Trustee with defendant's wife and the Rhode Island Hospital Trust Company of a trust, the principal of which would include the greater part of defendant's property, set up or to be set up, under defendant's will." The first cause remained constant and is the one upon which the judgment was eventually given. The second cause was amended, however, after plaintiff filed an affidavit stating that when he brought the action and later during his pre-trial examination he had been in error in thinking that the trust of which he was to be appointed co-trustee was to be set up under the defendant's will, that he was mistaken in his testimony, and that the trust was actually one *inter vivos*. But this was after the defendant's first pre-trial examination had disclosed that though defendant had a will in 1935, it did not set up any trusts and also that a Prince director received only nominal compensation. So the amendment as allowed covered not only the matter of the living trust, but the further allegation that plaintiff was to be appointed an officer and director of F. H. Prince & Co. All this is but one of many reflections of the uncertainties in plaintiff's testimony, as well as his rather hazy knowledge of defendant's affairs with which he was supposed to be so familiar. So at his

pre-trial examination, plaintiff talked in terms of futurity, rather than present contract. Thus he then quoted the defendant as saying: "I have decided that I would like to have you come with me. Before you do so, I want to make certain changes in my organization so as not to disturb them. Then I want you to come with me and act as personal adviser and consultant to me; and, in time, I will appoint you 'trustee' * * *. I will appoint you a trustee of the Maine company, that being the top holding company of my whole enterprise. Meanwhile I want you to stay at Morgan & Company until I get these organizational changes made."

In May, 1935, a month after this agreement, plaintiff says he told defendant that he had an offer of another position at double his Morgan salary, but that defendant asked him to "remain at Morgan's until I get these changes made" and he agreed to do so. But here hope deferred apparently did not make the heart sick. For in conversations on January 9 and 10, 1936, defendant appeared still to be talking in terms of futurity. "So I will ask you to wait a little longer, and meanwhile remain where you are at Morgan's." (Plaintiff said that there were also present at the conversation of January 9 Messrs. McDonough and Barriger; McDonough died in 1941 and at the trial Barriger denied—as did defendant—that the conversation ever took place.) So matters continued for ten years while defendant became 86 and plaintiff continued to work for him without any formal demand of which he has now proof in writing for fulfillment of the promise and with (on even his own testimony) very little importunity by word of mouth.[1] Plaintiff continued to work at Morgan's, his salary increasing from $3,240 to $3,933.-34 in 1936, $4,000 in 1937, and $4,500 in 1939. In 1940 he received an offer from Harriman, Ripley & Co. of $6,500, which he accepted—without demur from Morgan's;

with the latter firm he received increases to $7,054 in 1943, $7,450 in 1944, and $8,242 in 1945.[2] The eventual award made to him by the trial judge below was at the rate of $3,-600 per year for the period from April, 1935, to November 10, 1945.

It appeared at the trial that the plaintiff had the habit of retaining all sorts of memoranda; it is from these that he constructed the list of services rendered the defendant which impressed the trial court and which we shall discuss later. This makes it the more incredible (to us) that he cannot now show anything outside of his own word which points to such a contract. The only occasion when plaintiff admitted to the presence of disinterested witnesses was the meeting on January 9, 1936, where, as we have seen, Barriger, the survivor of the two others present, was positive that no such conversation as that claimed by plaintiff ever took place. Barriger, plaintiff's intimate friend, went further to say that he never heard defendant state he wanted plaintiff to join his organization; nor did plaintiff so inform Barriger. But, according to Barriger, as late as 1938 plaintiff did say that he was spending a good deal of time with defendant, and he was not interested in continuing unless he was to be compensated, "and on one or two occasions he made a statement that he was going to ask Mr. Prince for some money." This was some three years after the making of the supposed binding agreement. That plaintiff was willing to wait so long, particularly when advancing years might soon prevent fulfillment anyhow, betokens at least a marvelous patience. But further certain acts of his during the period increase incredulity.

Thus in August and September, 1935, four months after the contract is alleged to have been made, plaintiff took a Western trip for and at the expense of his employer, Morgan. In the course of that trip plain-

---

1. He testified to only 6 occasions in 10 years prior to the November 10, 1945, interview, when he took up the question of his appointment to the promised positions with defendant. After the early occasions up to January 10, 1936, these took place only at such intervals as

August, 1938, April, 1940, and March, 1944. Meanwhile at least four important appointments (to others) were made in defendant's organization.

2. He also received bonuses and extras thus: 1933, $700; 1937, $385; 1939, $5; 1944, $500; 1945, $1,700.

tiff and a geologist spent two days visiting a Wyoming ranch which had come into the possession of defendant's Chicago Livestock National Bank. His letter to the defendant, dated September 19, 1935, shows that this was a service he had volunteered to do "from a desire to contribute whatever I can in appreciation of the many kindnesses you have shown me in the past." [3] And as late as September 12, 1945, he recommended a tax counsel to defendant, offering to arrange a meeting and then adding, "I make this suggestion with all respect because of my continuing interest in your affairs, as you well know." On June 11, 1935, just after the contract date, he wrote an official of the Pennsylvania Railroad, who had written him of Prince's inquiries about him, to the significant effect that the old gentleman had "approached me in the matter and it may possibly lead to something. Will confer with you about it as it develops." [4]

To further such a development, plaintiff indulged in some far from admirable scheming in November and December, 1935: he wrote two letters headed "Dear Father," which Prince's son was supposed to sign and mail as his own. The first was a statement of pending substantial increases in the federal gift tax and clearly suggested the desirability of making gifts at once. Plaintiff admitted that he knew defendant did not intend his son ever to have over $100,000 a year, and that he wrote the letter to induce defendant to make a substantial gift to his son. The second was an attack upon the loyalty to defendant of the "Dear Father's" own secretary, McDonough—thus disclosed as a rival in plaintiff's estimation, although the contract of a few months before should have put plaintiff far beyond a mere secretary's reach. Plaintiff explained that it was necessary to keep McDonough from suspecting that he was trying to injure him in any way. Had defendant known of these maneuvers, his reaction can be easily imagined.

The record is too voluminous to be discussed in full; what we have said gives a fair flavor of the relations between the parties. There is no question of their friendly intercourse during this decade. Plaintiff called on defendant at the latter's New York hotel, and on a few occasions visited him at his Newport and Aiken residences; his wife and daughter were guests at defendant's Wyoming ranch in June, 1947. Plaintiff had borrowed small sums from defendant on interest-bearing notes: $700 in 1941, which was paid off; $850 on June 8, 1945; and $2,500 on November 10, 1945. The last was consolidated with the amount due on the previous loan in one note of $3,300, of which $3,000 remained unpaid at the time of trial. At times defendant appears to have asked for small bits of financial information and the like; the limited and offhand character of these requests is

3. "Dear Mr. Prince,
"I have just returned from a month's inspection trip over the Northern Pacific Railway. In the course of the trip I took occasion to run down to your magnificent ranch, Padlock, and I am greatly indebted to you for suggesting that I do so. It is a glorious place and I found it difficult to leave there after two days. I took with me the chief geologist of the State of Montana, Dr. Perry, whom I had met through mutual friends, thinking that he might have some constructive ideas as to the possibility of oil or minerals on Padlock.
" * * * Mr. Smith, your manager at Padlock, knowing of course that the big problem on all Wyoming ranches is that of water, inquired of Dr. Perry as to the possibilities of drilling for artesian water. The geologist felt that one particular spot looked attractive to him for drilling,

and subsequently told me he would give it more study based upon their data as to the geological formations. Though it may appear at first hand that I have taken some liberties in respect of Padlock's problems, I am sure you will appreciate that the geologist accompanied me and devoted his time gratis and purely on a friendly basis whereas my interest arises only from a desire to contribute whatever I can in appreciation of the many kindnesses you have shown me in the past."

4. Neither of these letters was actually in evidence. But plaintiff relies on the letter to him, and defendant asserts with some justice the right to rely on plaintiff's answer, which was definitely admissible as an admission and of which his counsel was apparently not aware.

anything but suggestive of a right to demand more important advice continuously.

The final scene on November 10, 1945, is as curious as any. According to plaintiff's testimony he went to see defendant at Newport, and defendant asked him to go to Chicago to undertake a study of the losses of the Stock Yards Company. Plaintiff replied that because of the time involved he should have to take a leave of absence or resign from his business position, but that he was prepared to resign if the agreement between them would be put into effect. Then Prince told plaintiff that he had appointed his own nephew in plaintiff's place and plaintiff was not to be trustee and officer in his companies. Plaintiff protested that he was shocked, and asked if he was not entitled to compensation or at least out-of-pocket expenses. Defendant asked what they were; plaintiff gave $2,500 as the figure; and defendant, saying "That is nothing, my boy; nothing," gave him a check. But plaintiff would not receive it outright and insisted on giving a note for it; this is the transaction previously noted where the earlier debt was consolidated in a single note of $3,300, to be repaid at the rate of $100 a month. Plaintiff's explanation of his strange course is that he wanted to prevent the defendant from claiming that the check was in full payment for all his years of service. Defendant's own testimony was that "he came down to borrow money and I let him have it. * * * That he was hard up and wanted some money, you understand, to help him out, and I let him have the money."

Against this background the services which eventually impressed the district judge as unusual assume their proper perspective. We agree with defendant's statement in his brief: "Plaintiff's alleged services were no more than a voluntary and relatively inconsequential investment of his spare time in his campaign for self-advancement. He admitted that they were rendered with no thought of money compensation but only in appreciation of courtesies and assistance extended to him by defendant. His claim (which he did not assert for over twelve years) was an afterthought, prompted by disappointment over defendant's failure to give him employment."

It will serve no good purpose to rehearse these services in detail. Many are attentions of the most trivial sort. Some verge on the ludicrous, as where the defendant is charged for services rendered on account of the information in the "Dear Father" letters conveyed through the supposed agency of the son! But the bulk are obviously the use in some form or other—often by direct, even if inapposite, quotation—of the reports, statistics, and general financial information which are the small-change of all investment houses. Indeed, to anyone who has received the assiduous attention of investment salesmen, the amount of material submitted by the plaintiff, given the opportunity he had, seems so small as to suggest that he exercised admirable restraint. It in no way justified the remuneration granted, which for a part of the period was at a greater rate than that received by plaintiff in his regular and supposedly full-time employment. As to the plaintiff's own inflated claim of $187,000—based on the testimony of a railroad consultant as expert and roughly on the amount the latter's firm would have charged on a full-time retainer basis—we regard that as more a tactic of defense on this appeal, so little basis is there for any upward revision of the award below.

The case was tried in December, 1948. On June 23, 1949, the district judge filed a lengthy memorandum showing that his earlier skepticism as to the plaintiff's case had been overcome. He held, however, that the agreement had not been proven, but directed recovery on *quantum meruit* for services. Plaintiff filed extensive findings of fact which the court accepted; while defendant filed a motion for a new trial which came on for a hearing in November, 1949. This was a stormy affair. The judge was obviously on the defensive because of the attacks made upon his decision, and hence he interrupted counsel so continuously that no connected argument was possible. But in the course of his remarks the judge did indicate what had led him to the opinion he finally formed. For he came to the conclusion that defendant

was trying to establish a means of getting secret information about Morgan's investment activities, and he had no doubt "that many secrets of Morgan's office which would never have been given to this defendant were given to him * * * what he was trying to find out was what was going to happen to his own investments, and he was looking for investments wherever he could get them, and here was a fellow working for Morgan & Company who knew what Morgan & Company was going to do, and he at least thought that very beneficial." An agreement for such a purpose would appear to be in violation of N.Y.Penal Law § 439, McK.Consol.Laws, c. 40, as defendant here asserts; and plaintiff has indignantly repudiated an insinuation so damaging to his own case and character. There is no suggestion of it in the record. The district judge seems to have been further offended because, as he stated, the defendant attempted to visit him in chambers, either after or, as the judge finally concluded, just before his decision.

On this hearing, too, defendant's counsel raised particular objections to Findings 18–22—those finding the special contract proved, but too vague to be enforceable—on the grounds that they were inconsistent with the opinion. The judge agreed, holding them inconsistent with his view that no contract had been proved, and saying that the first 17 paragraphs dealing with the claim in *quantum meruit* were adequate for the recovery in any event. Later, however, he filed an order refusing to make any change in the findings and the judgment was entered on March 28, 1950.

As they stand, therefore, there is a certain inconsistency or hiatus in the findings which we should find troublesome were we to accept them as filed. The first 17 set forth in some detail that plaintiff "at the request of defendant" rendered him valuable and beneficial services as "a personal adviser and consultant on financial matters" from April, 1935, to November, 1945, that these services included certain specified activities, that plaintiff is entitled to compensation for them "on a quantum meruit basis," and that they were of the value of $38,100. There is no finding that the de-

fendant promised to pay for these services; nor was there any evidence to that effect. As we have seen, plaintiff stated specifically that he did not expect payment for them; he did expect the appointments as officer and director of defendant's companies and trustee of defendant's trust. Findings 18–22 state an express promise by defendant to make such appointments, in consideration for which plaintiff acted as defendant's personal consultant and financial adviser. Thus the existence of the express contract belies the claim for payment of services rendered. We find some difficulty in understanding why the judge thought such a contract was so vague as to be unenforceable. The damages may have been uncertain and doubtless they would have been less than the award made, since plaintiff never did go to Chicago to enter upon his part of the contract and his loss was only that of a job opportunity. But the contract itself seems not less definite than many for personal service. Accepting, however, the conclusion that the contract was thus too indefinite to be enforced we still have the difficulty of a lack of showing or finding that these services for which compensation was granted were rendered in reliance upon the promise.

■ A contract for payment for services cannot be implied for the parties against their intention or understanding. Miller v. Schloss, 218 N.Y. 400, 406, 113 N. E. 337; Grombach Productions v. Waring, 293 N.Y. 609, 615, 59 N.E.2d 425. There must be some showing that the defendant intended to obligate himself in some form, *i.e.*, that the services were not expected to be gratuitous. Green v. Messing, 236 App. Div. 107, 258 N.Y.S. 82, 86; Williams v. Adams, 250 App.Div. 603, 295 N.Y.S. 86, 94. Here the services because of both their trivial nature and the circumstances under which they were rendered do not themselves demonstrate their nongratuitous character. There is no finding whatsoever that the services for which recovery was granted were made in reliance upon the claimed promise. As we have indicated, the evidence to us seems against such a view. Plaintiff was providing defendant with these financial and other tips either to in-

904

gratiate himself generally with the defendant or in the hope of expediting the long delayed performance of defendant's promise. It is difficult to see, however, what part they have in his own promised performance to go to Chicago and work up in the business. The findings therefore do not support the judgment rendered and reversal would seem necessary in any event. We need not pursue this further, however, since we hold that neither express contract nor agreement to pay for services was proved by credible evidence.

This conclusion makes it unnecessary to consider the defendant's contention, argued at length in the appeal, that the applicable statute of limitations in New York barred all or at least a substantial part of the plaintiff's claim.

On the plaintiff's appeal we find no error. On the defendant's appeal, the judgment is reversed and the action is ordered dismissed on the merits.