NATIONAL LABOR RELATIONS BOARD
v. DINION COIL CO.

No. 52, Docket 22421.

United States Court of Appeals
Second Circuit.

Argued Nov. 6, 1952.

Decided Dec. 24, 1952.

486

George J. Bott, David P. Findling, A. Norman Somers, Frederick U. Reel, Washington, D. C., and Rosanna A. Blake, Takoma Pk., Md., for National Labor Relations Board.

J. A. Bruggeman, Barrett, Barrett, & McNagny, Fort Wayne, Ind., for respondent.

Before SWAN, Chief Judge, and L. HAND and FRANK, Circuit Judges.

FRANK, Circuit Judge.

■ 1. We think that, on the record as a whole, the evidence supports the findings of fact which in turn justify the Board's legal conclusions and order. Respondent offered no proof concerning the percentage of its employees who were union members on July 21, 1950. Absent such proof, the fact that, in the circumstances, more than 90% of those discharged on that date were members of the union suffices to make not unreasonable the Board's inference that respondent discriminated against union members, and that the discharges on that particular date were not caused by respondent's fear (engendered by President Truman's July 19 speech) that respondent's production of certain civilian goods would have to be drastically curtailed in favor of defense production—especially as, within a week of the election held on August 15 and at which the union succeeded, respondent began to hire back some of the discharged union employees and soon rehired almost all of them.

2. However, one employee, Tennent, although an active union member, was not discharged until July 28, a week later than the others. Holland, respondent's vice-president, testified that the sole reason for Tennent's discharge was his signal inefficiency or carelessness. According to Holland, when he learned in Baltimore on July 28 that a customer of respondent had received from it more than 6,000 defective transformers, he telephoned from Baltimore to respondent's plant directing the discharge; this he did, he testified, because the defects resulted from Tennent's failure properly to "set up" the machines on which the transformers were wound. Were this testimony believed, Tennent's discharge would not have violated the Act, 29 U.S. C.A. § 151 et seq.

But there was also this testimony by Tennent: Ayers (whom the Board, on sufficient evidence, found to be Holland's "right hand man") on July 28 "just a couple of minutes before quitting time" handed Tennent a discharge slip, and told Tennent he did not know the reason for the discharge. The discharge slip, identical in wording with those which had been handed to the employees discharged on July 21, read as follows: "Due to changes in our production requirements, it is necessary that we reduce our work force. Therefore, you are hereby notified that your employment with the Company is terminated." On December 5, 1950, Tennent, at respondent's request, returned to his former job with respondent. On February 6, 1951, he received an increase in pay. Moreover, Holland also testified that, if Tennent followed erroneous specifications, he would not have been responsible for the defective transformers; and that these transformers, after leaving Tennent's hands, had been subjected to "probably in the vicinity of between four and six inspections" for the purpose of discovering " just the thing * * * that failed in this job."

■ Respondent argues that there is nothing in this testimony which cannot reasonably be reconciled with Holland's testimony about the reasons for this discharge.[1] Whether, on that basis, we would

1. E.g., respondent argues that it rehired Tennent because it was unable to find a more suitable substitute.

over-turn the finding adverse to respondent we need not consider. For all the testimony was given orally before the Trial Examiner who stated in his report: "On the entire record, including *his observation of the witnesses,* the undersigned is not persuaded that Tennent was discharged by the Respondent for the reasons advanced by it. *The undersigned does not credit Holland's testimony,* to the effect that he ordered Tennent's discharge because defective material had been made in and shipped from the Respondent's plant." (Emphasis added.) The Board adopted this finding. If it stands, then Holland's testimony must be ignored. On that basis, we cannot say that the Examiner and the Board did not have ample evidence to support their conclusion that Tennent's union activities were the reason for his discharge: Although he was fired a week later than the other union members, the firing occurred before the election; when the company notified him of his discharge on July 28, his inefficiency or negligence was not assigned as a reason;[2] despite this alleged inefficiency, he was later rehired and subsequently his pay was increased. These facts constitute a sufficient foundation for a rational inference that Tennent's union activity induced the discharge.

▇▇▇▇ If, in similar circumstances, a trial judge made such a finding, we would be obliged to accept it. For the pivotal factor here is the Examiner's disbelief in Holland's testimony, a disbelief that rested on an evaluation of Holland's credibility, which in turn the Examiner founded upon "his observation of the witnesses." Repeatedly, the courts have said that, since observation of such "demeanor evidence" is open to a trier of the facts when witnesses testify orally in his presence, and since such observation is not open to a reviewing tribunal, that fact-trier's findings, to the extent that they comprise direct or "testimonial" inferences,[3] are ordinarily unreviewable. True, demeanor evidence may sometimes mislead; but our courts regard it nevertheless as an excellent clue to the trustworthiness of testimony. The Federal Civil Procedural Rules, 28 U.S.C.A., reflect this view.[4]

It has had a long history. In the earlier period of Roman legal development, ac-

2. See N. L. R. B. v. Smith Victory Corp., 2 Cir., 190 F.2d 56, 57. There we said that, if inefficiency, the reason an executive of the employer corporation assigned in his testimony, was the actual reason for an employee's discharge, "It is extremely unlikely" that the executive "would have suppressed it and told" the employee, "instead, that she was unsatisfactory because she was discontented."

3. See American Tobacco Co. v. The Katingo Hadjipatera, 2 Cir., 194 F.2d 449, 451: "We accept, as we must, those of the trial judge's inferences of fact which he drew directly from his estimates of the credibility of witnesses whom he observed as they testified in his presence—i.e., his inferences (sometimes called 'testimonial inferences') that certain facts existed because he believed some witness or witnesses who testified before him that those facts did exist. We are not required, however, to accept a trial judge's findings, based not on facts to which a witness testified orally, but only on secondary or derivative inferences from the facts which the trial judge directly inferred from such testimony. We may disregard such a finding of facts thus derivatively inferred, if other rational derivative inferences are open. And we must disregard such a finding when the derivative inference either is not rational or has but a flimsy foundation in the testimony."

4. Rule 43(a) provides in part: "In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by these rules." Moore, Federal Practice (2d ed.) § 43.03 (p. 1318) says that this provision "has the *obvious advantage of permitting judge or jury to observe the appearance and demeanor of witnesses so as to determine more readily their veracity (or lack thereof)* and the weight to be given their testimony. The only qualification upon the use of oral testimony is that made by other Federal Rules—rules on deposition and discovery." Rule 26(d) (3), with reference to depositions, contains a provision which speaks of "due regard to the importance of presenting the testimony of witnesses orally in open court * * *." Moore, Federal Practice (2d ed.) § 26.30 (pp. 1194–95) says "The words 'with due regard to the importance of presenting the testimony of witnesses in open court'

cording to Millar, the witnesses testified orally before the judex, and the practice of having oral testimony heard by the judge prevailed originally in the Roman-canonical procedure.[5] Ullman tells us that the 14th century Postglossators—who, as judges or advocates, "had their eyes fixed upon the practical administration of the law"—maintained that the "indispensable requisite for the judge to form his opinion on the trustworthiness of witnesses was that they appeared before him personally. * * * The personal impressions made upon the judge by the witnesses, their way of answering questions, their reactions and behavior in Court, where the only means of ascertaining whether their statements were trustworthy or not. * * * It was thought necessary, therefore, that the judge * * * should put on record in the files any specific reactions, e.g., that the witness stammered, hesitated in replying to a specific question, or showed fear during the interrogation * * *."[6] Subsequently, however, written testimony became in general the norm in canon and lay continental courts until the 19th century.[7] In English chancery it came about that the "canon law influence prevented the oral examination of witnesses save as an extraordinary measure," while at English common law the testimony was oral.[8] For the most part, America inherited this difference between chancery and common law procedures. In the federal courts, except for a short period from 1789 to 1802, oral testimony in open court was not required in equity litigation; indeed, for many years it was virtually banned.[9] But Rule 46 of the Equity Rules of 1912 reverted to the 1789–1802 practice of reliance on oral testimony as the normal method in equity suits. The present Civil Rules continue that valuable reform.

The result of the stress on demeanor is to confer immense discretion [10] on those who, in finding facts, rely on oral testimony.[11] But few doubt that the risk involved is, on the whole, well worthwhile. This is true despite the fact that methods of evaluating the credibility of oral testimony do

are a warning that this provision is not to be used as authority for trying cases generally upon depositions in the manner in which all equity cases were tried prior to the adoption of the Equity Rules of 1912 [28 U.S.C.A.Appendix]." He goes on to say that the Advisory Committee originally proposed a provision that a deposition could be used for all purposes at a trial if the parties consented and the court approved. This provision, writes Moore, was dropped and the present provision substituted because it was feared that the court would grant its approval whenever the parties consented "and thereby to that extent nullify the salutary rule that testimony of witnesses should be taken orally in court." In Rule 52(a) is a provision which reads: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." As to this provision, see Moore, Federal Practice, § 52.04 (pp. 2638, 2642), quoting with approval the comments in Orvis v. Higgins, 2 Cir., 180 F.2d 537.

In accord, see, e.g., Arnolt Corp. v. Stansen Corp., 7 Cir., 189 F.2d 5, 10; Fritz v. Jarecki, 7 Cir., 189 F.2d 445, 448; Perry v. Perry, 88 U.S.App.D.C. 337, 190 F.2d 601, 602; United States v. El-O-Pathic Pharmacy, 9 Cir., 192 F.2d 62,

66–67. See also Rule 53(c) and comment of Moore, § 53.05 (p. 2933).

5. Millar, in Engelmann, History of Continental Civil Procedure (1927) 64.

6. Ullman, Medieval Principles of Evidence, 62 L.Q.Rev. (1946), 77, 83–84. See also Ullman, The Medieval Idea of Law (1946) 124–125. Cf. Tourtoulon, Philosophy in The Development of Law (1922) 396–397.

7. Millar, supra, 64–65.

8. Millar, ibid., 60.

9. Orfield, Appellate Procedure In Equity Cases, 90 U. of Pa.L.Rev. (1942) 563, 587–588; Millar, Civil Procedure of the Trial Court In Historical Perspective (1952) 270–271.

10. That the fact-trier's power to select part of the oral testimony as reliable constitutes "discretion," see, e.g., Woey Hoe v. U. S., 9 Cir., 109 F. 888, 890; Nash v. Fries, 129 Wis. 120, 108 N.W. 210; Griffin v. State, 12 Ga.App. 615, 77 S.E. 1080, 1081.

11. See Broadcast Music v. Havana Madrid Restaurant Corp., 2 Cir., 175 F.2d 77, 80: "Without doubt, the result of our procedure is to vest the trial judge with immense power not subject to correction even if misused: His estimate of an orally testifying witness' credibility may

not lend themselves to formulations in terms of rules and are thus, inescapably, "un-ruly." In his brilliant discussion of evidence, Sir James Stephen illuminated the difficult task of a trial judge who, observing a witness in the brief period when the witness appears in court, tries to ascertain how far the witness' "powers of observation and memory * * * enable him to tell the truth" and "how far the innumerable motives, by any one of which he may be activated, dispose him" to do so. "No rules of evidence * * * can perceptibly affect this difficulty," Stephen remarked. "Judges [i.e., trial judges] must deal with it as well as they can by the use of their natural faculties and acquired experience, and the miscarriages of justice in which they will be involved by reason of it must be set down to the imperfection of our means of arriving at truth. The natural and acquired shrewdness and experience by which an observant man forms an opinion as to whether a witness is or is not lying, is by far the most important of all a [trial] judge's qualifications, infinitely more important than any acquaintance with law or with rules of evidence. No trial ever occurs in which the exercise of this faculty is not required; but it is only in exceptional cases that questions arise which present any legal difficulty, or in which it is necessary to exercise any particular ingenuity in putting together the different facts which the evidence tends to establish. This pre-eminently important power for a [trial] judge is not to be learnt out of books. Insofar as it can be acquired at all, it is to be acquired only by experience, for the acquisition of which the position of a judge is by no means peculiarly favourable. People come before him with their cases ready prepared, and give the evidence which they have determined to give. Unless he knows them in their unrestrained and familiar moments, he will have great difficulty in finding any good reason for believing one man rather than another * * * Upon the whole, it must be admitted that little that is really serviceable can be said upon the inference from an assertion [by a witness] to the truth of the matter asserted. The observations of which the matter admits are either generalities too vague to be of much practical use, or they are so narrow and special that they can be learnt only by personal observation and practical experience. Such observations are seldom, if ever thrown by those who make them into the form of express propositions. Indeed, for obvious reasons, it would be impossible to do so. The most acute observer would never be able to catalogue the tones of voice, the passing shades of expression or the unconscious gestures which he had learnt to associate with falsehood; and if he did, his observations would probably be of little use to others. Every man must learn matters of this sort of himself, and though no sort of knowledge is so important to a judge, no rules can be laid down for its acquisition * * * No process is gone through, the correctness of which can be independently tested. The judge has nothing to trust but his own nature and acquired sagacity." [12] Sir Henry Maine agreed with Stephen. He said that there are no "rules to guide" a "Judge of the Fact" in "drawing inferences from the assertion of a witness to the existence of the facts asserted by him." "It is," he wrote, "in the passage from the statements of a witness to the inference that those statements are true, that judicial inquiries generally break down. The English procedure of examination is doubtless entitled to high praise; but, on the whole, it is the rarest and highest personal accomplishment of a judge to make allowance for the ignorance and timidity of witnesses,

stem from the trial judge's application of an absurd rule-of-thumb, such as that when a witness wipes his hands during his testimony, unquestionably he is lying; but, unless the judge reveals of record that he used such an irrational test of credibility, an upper court can do nothing to correct his error. We thus have what Tourtoulon called the 'sovereignty' of the trial judge. Demeanor, to be sure, is no infallible guide to reliability of testimony; yet, as matters now stand, it is one of the best guides available."

12. Stephen, The Indian Evidence Act, With An Introduction on the Principles of Judicial Evidence (1872) 41–43.

and to see through the confident and plausible liar. Nor can any general rules be laid down for the acquisition of this power which has methods of operation peculiar to itself, and almost indefinable." [13] This lack of rules ("un-ruliness"), with its concomitant wide discretion in the fact-trier, yields inherent difficulties not surmountable by a reviewing court, [14] regardless of whether the fact-trier be a judge, a jury, or a trial examiner.

In line with the foregoing remarks, we said in N. L. R. B. v. Universal Camera Corp., 2 Cir., 190 F.2d 429, 430, that, in the light of the Supreme Court's decision in that case, [15] the Board must give considerable weight to findings of an Examiner based directly upon the "bearing and delivery" of witnesses who orally testified before him. So that, although the Board vis à vis the Examiner as to findings is not in exactly the same position as an upper court with respect to a trial judge, [16] we surely may not upset the Board when it accepts a finding of an Examiner which is grounded upon (a) his disbelief in an orally testifying witness' testimony because of the witness' demeanor or (b) the Examiner's evaluation of oral testimony as reliable, unless on its face it is hopelessly incredible —cf. Gindorff v. Prince, 2 Cir., 189 F.2d

897—or flatly contradicts either a so-called "law of nature" or undisputed documentary testimony—cf. Orvis v. Higgins, 2 Cir., 180 F.2d 537. As we said in N. L. R. B. v. Smith Victory Corp., 2 Cir., 190 F.2d 56 at page 57, "Upon the evidence before us we should unhesitatingly have held that a judge's finding to the same effect was not 'clearly erroneous,' and Universal Camera Corp. v. N. L. R. B., supra, did not make the findings of the Board as vulnerable as those of a judge." It should be noted that, in the Universal Camera Corp. case, the Supreme Court said, 340 U.S. at page 495, 71 S.Ct. at page 468: "Nothing in the statutes suggests that the Labor Board should not be influenced by the examiner's opportunity to observe the witnesses he hears and sees and the Board does not."

3. Only three union members, Docking, Crane and Margaret Carroll, were discharged July 21, 1950 and never rehired. The Board ordered them reinstated. The Examiner disbelieved the oral testimony of respondent's witnesses (summarized in the accompanying footnote) [17] as to the reasons for firing those three employees. What we have said above with reference to the evaluation of oral testimony applies here: Were this an appeal from a trial judge, we would not disturb the findings.

13. Maine, Village Communities (4th ed., 1881) 317–318.

14. Dean Pound writes, "Experience in common law jurisdictions has made it abundantly clear that the best mode of ascertaining facts is an oral trial or hearing at which witnesses are examined and cross-examined in court. Even reports of experts are more reliable when made in open court and subjected to reasonable cross-examination." But Pound also says that "Where evidence is taken orally in open court, even if fully transcribed verbatim, much of what is important in arriving at a determination of the facts is lost to a reviewing court. Hence it is universally agreed that the scope of review on the facts is necessarily limited. * * *" Pound, Appellate Procedure In Civil Cases (1941) 5–6.

15. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S. Ct. 456, 95 L.Ed. 456.

16. See Universal Camera Corp. v. National Labor Relations Board, supra, 340 U.

S. at page 492, 71 S.Ct. at page 467: "The responsibility for decision thus placed on the Board is wholly inconsistent with the notion that it has power to reverse an examiner's findings only when they are 'clearly erroneous.' Such a limitation would make so drastic a departure from prior administrative practice that explicitness would be required."

17. Holland in his testimony assigned as the "basic" reason for Docking's discharge that he had been drunk at respondent's Christmas party in December 1949, more than six months previous to to the discharge. Docking had never been admonished for this behavior. His rate of pay had been increased during the week ending June 24, 1950. Holland also testified he had seen Docking nail movable equipment to the floor; but Holland could not recall when this had happened. Holland further testified that he had received from McCully a memorandum reporting unsatisfactory work in the maintenance department. This department (exclusive of the foreman) consisted of

4. Charges of unlawful discharges of designated employees were filed, amended and served by August 21, 1950. This was within six months from July 21, 1950, the date of those discharges. A complaint based on these charges was filed on January 17, 1951. The hearing began February 21, 1951. During the hearing, the Board directed that the complaint be amended, over respondent's objection, to add the names of two employees—Mary Clemens, discharged July 21, 1950, and Tennent, discharged July 28, 1950. These two discharges occurred about seven months before the filing of the amendment. The Board's subsequent order directed reinstatement or back pay for the employees named in the complaint as amended. Respondent contends that, as to the two employees named in the amended complaint, that order is invalid because of the following provisions of § 10(b) of the Act: "Provided, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces * * *. Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon." Following precedents in other circuits, our court has already rejected that contention. N. L. R. B. v. Gaynor News Co., 2 Cir., 197 F.2d 719, 721–722.[18] See, e.g., N. L. R. B. v. Kobritz, 1 Cir., 193 F.2d 8, 15–16.[19] The holding of these decisions may be summarized thus: (1) A complaint, as distinguished from a charge, need not be filed and served within the six months, and may therefore be amended after the six months. (2) If a charge was filed and served within six months after the violations alleged in the charge, the complaint (or amended complaint), although filed after the six months, may allege violations not alleged in the charge if (a) they are closely related to the violations named in the charge, and (b) occurred within six months before the filing of the charge.

Respondent also argues that the making of the amendment during the hearing was procedurally irregular and therefore invalid. This argument must fail because, all else aside, "there was no showing of surprise which may have hampered presentation of respondent's defense on this aspect of the case." N. L. R. B. v. Roure-Dupont Manufacturing Co., Inc., 2 Cir., 199 F.2d 631, 633.

Enforcement will be granted.

---

three employees, Docking, Crane and one Miller. McCully, a supervisory employee, came to respondent's plant on July 17, 1950. He testified that on July 20, three days later, he delivered to Holland a memorandum which said that two men in the maintenance department were incompetent and should be replaced. The memorandum did not state their names. McCully testified that he had had in mind Docking and either Crane or Miller. But all three were discharged on July 21. Holland said nothing of the McCully memorandum in testifying as to the reasons for Crane's discharge but explained that Crane acted as if he "had sleeping sickness" and "couldn't perform." Holland said he had observed this inadequacy "very close" to the "first day" Crane was employed; but the discharge did not happen until July 21, 1950, after Crane joined the union.

In his report, the Examiner said: "The undersigned does not credit McCully's testimony to the effect that he reported either Docking or Crane as inefficient and requested their discharge"; he said he "seriously doubts" whether McCully "actually delivered" the memorandum to Holland.

Holland testified that it "was a general comment" that Margaret Carroll "was not satisfactory to the supervisor" of the department in which Miss Carroll worked, Miss Hendry. According to Holland, Miss Hendry selected Miss Carroll for discharge. Miss Hendry did not testify. Holland, on cross-examination, said that Miss Hendry objected to discharging anyone in her department because "they are all good."

18. See decisions in other circuits there cited.

19. See 193 F.2d at page 16 for some illuminating legislative history.