**M. Shafi IRAVANI MOTTAGHI, Plaintiff-Appellant,**

v.

**BARKEY IMPORTING CO., Defendant-Appellee.**

No. 22, Docket 23926.

United States Court of Appeals Second Circuit.

Argued Dec. 5, 6, 1956.

Decided March 29, 1957.

As Amended on Denial of Rehearing April 29, 1957.

Writ of Certiorari Denied June 24, 1957. See 77 S.Ct. 1402.

Thomas F. Meehan, New York City, for plaintiff-appellant.

Kresel & Meyerson, Harold I. Meyerson, New York City (Isidor J. Kresel, Saul Gordon and Irving L. Weinberger, New York City, of counsel on the brief), for defendant-appellee.

Before CLARK, Chief Judge, and FRANK [*] and LUMBARD, Circuit Judges.

LUMBARD, Circuit Judge.

This is a contract action brought by M. Shafi Iravani Mottaghi (hereinafter Iravani), a citizen of Iran, against Barkey Importing Co., Incorporated in New York (hereinafter "BIC"). Iravani's complaint contained ten causes of action, on all of which the district court ultimately found against him. BIC filed a counter-claim, which the district court also found that Iravani had admitted. The court therefore entered judgment for BIC in the sum of $139,723.31, the full amount of the counter-claim. Iravani appeals.

There are four main contracts, as to the existence of which there is no dispute, but as to the performance of which there are many, as well as many alleged modifications of these agreements; in addition, there are many other agreements as to the existence and scope of which the parties differ radically. Most of the negotiations on these alleged agreements took place by correspondence and findings had to be made on the slimmest of evidence. The district judge filed an opinion of 84 pages, D.C.S.D.N.Y.1955, 134 F.Supp. 719–802, and although we can well understand the difficulties of the problems he faced, we must reverse on certain issues and remand for certain additional findings on other issues.

We shall first set out chronologically a statement of the events which gave rise to this litigation.

I. Chronology of Events

In general, the case before us deals with shipments of Iranian carpet wool by Iravani in Iran, through his agent, Randolph Valensi in New York, to BIC, also in New York. Iravani had never sold any wool before. In late 1949 Valensi became Iravani's American agent and in December 1949 Iravani and BIC contracted for the sale of 350 tons [1] of greasy [2] white [3] wool, to be delivered by February 15, 1950, at 60 cents per net pound clean basis. A letter of credit was opened by BIC in Iravani's favor, to be used only for bills of lading dated not later than February 15, 1950. In January Iravani indicated he would not be able to complete the contract in time. In February the contract was modified in Iran by Iravani and BIC's agent, Robert Kitching, in that in place of 50 tons of washed white wool, Iravani was permitted to ship 40 tons of greasy cream wool. No price change appears or is material. It is clear

[*] Judge Frank died before this opinion was completed, but he expressed a tentative vote for reversal along the lines of this opinion.

1. Each ton consisted of 2,240 pounds.

2. "Greasy wool" is unwashed wool. If some of the impurities have been removed before shipment the wool is known as "washed wool." "Clean wool" is wool that has had all impurities removed after shipment. The amounts in the agreements before us all refer to wool in the grease; payment however, is on the basis of a certain amount per clean pound.

3. Other types of wool here relevant are "cream" which is light gray in color, and "colored" which is neither white nor gray but generally black or brown.

that the contract, even as modified, was not completed in time and one of the basic disputes in the case is when this first contract was finally completed. Iravani claims completion was on December 5, 1950; BIC claims the contract was not completed until January 1951.

Throughout January and February 1950 there are many indications in the correspondence of Iravani's great difficulties in shipping the wool, of Iravani's very precarious financial position and that BIC was made aware of this. Valensi also corresponded with Iravani about the possibility of a consignment arrangement with BIC for shipments of colored wool at prices much lower than for white wool.

In April the S. S. Steel Artisan embarked from Iran carrying 70 tons of wool.[4] BIC accounts indicate this was composed of 36 tons white and 34 tons cream, all allocable to the First Contract at 60 cents. There is no substantial dispute as to this.

In April two more contracts were made between Iravani and BIC. The first of these (the "Second Contract") was executed between April 17 and 19, 1950, and was for 300 tons of white wool (200 greasy and 100 washed) at 70 cents per net clean pound, shipment not later than June 5, 1950. A second letter of credit was opened to cover this, not to be drawn against until the first letter of credit was exhausted.

The other contract ("Third Contract") was executed between April 21 and 25, 1950 for 100 tons of cream wool at 60 cents per net clean pound, shipment during July/August from Iran. Also in April, Valensi again advised Iravani that BIC "would be willing to help finance a consignment of up to 150 tons of other color wools."

By June 1950 the market for wool in both the United States and Iran had started to rise rapidly, induced in Iran partly by the presence of American buyers there. Since Iravani, following Iranian business custom, did not receive delivery until after he had made his contracts to sell, he was caught between low-price contracts with his customers and rising prices from his suppliers. Moreover, Iravani was habitually short of capital. In May he wrote that his "greatest difficulty was the matter of finance" and about that time found it necessary to mortgage his property to raise $100,000 for the purchase of wool, which was all the money he had.

4. In all, there were twenty sailings from Iran to New York, on which wool was delivered to BIC. For convenience, we shall list them chronologically, in order of sailing, with voyage numbers assigned to them.

| Voyage Number | Name | Date of Departure | Date of Arrival |
|---|---|---|---|
| 1 | Steel Artisan | 4– 7–50 | 6– 4–50 |
| 2 | Lemsterkerk/Westerdam | 5–21–50 | 7–17–50 |
| 3 | Steel Designer | 6–11–50 | 7–20–50 |
| 4 | Laagkerk/Westerdam | 7– 3–50 | 9–13–50 |
| 5 | Steel Apprentice | 7–21–50 | 9– 7–50 |
| 6 | Lindekerk/Arkeldyk | 8– 5–50 | 10– 6–50 |
| 7 | Lindekerk/Averdyk | 8– 5–50 | 11– 4–50 |
| 8 | Lissekerk/Alblasserdyk | 8–19–50 | 10–21–50 |
| 9 | Steel Artisan | 8–24–50 | 10– 4–50 |
| 10 | Steel Designer | 9–20–50 | 11– 2–50 |
| 11 | Steel Apprentice | 11–23–50 | 1– 4–51 |
| 12 | Steel Artisan | 12–31–50 | 2– 4–51 |
| 13 | Alamak/Leerdam | 1–18–51 | 3–10–51 |
| 14 | Laurenskerk/Aagtedyk | 2– 1–51 | 3–29–51 |
| 15 | Steel Worker | 2– 9–51 | 3–28–51 |
| 16 | Steel Designer | 3–31–51 | 6– 5–51 |
| 17 | Steel Seafarer | 4– 1–51 | 5– 8–51 |
| 18 | Leonekerk/Westerdam | 5–19–51 | 7– 9–51 |
| 19 | Saporea/Blydendyk | 5–25–51 | 7–21–51 |
| 20 | Steel Voyager | 6–14–51 | 7–20–51 |

In May the S. S. Lemsterkerk/Westerdam (voyage #2) set out for the United States with what our calculations show to be from 144 to 149 tons of wool,[5] and arrived in New York on July 17, 1950. Iravani did not invoice his shipments until later and the three invoices covering this shipment billed approximately 129 tons at 60 cents (the two invoices on this were dated July 6, 1950 and December 5, 1950) allocable to the First Contract and 20 tons at 70 cents (invoice dated July 6, 1950) evidently allocated to the Second Contract. On the other hand, BIC's accounts differed as to both allocation to contracts and prices. BIC's original accounts with respect to this shipment are that 58 tons were white wool, 6 tons were cream, and only this was allocated to the First Contract. BIC allocated nothing to the Second Contract and 30 tons cream to the Third. 50 tons were colored wool, allocable to no contract and paid for at 42 cents per net clean pound. This was in accord with BIC's consistent accounting procedure whereby it allocated nothing to the Second Contract until the First was completed, allegedly in January 1951.

In June 1950, BIC was told by Kitching that Iravani was taking a severe loss on the First Contract because of the rising market. Although BIC expressed great annoyance at Iravani's failure to complete the contracts in time, Iravani persuaded BIC to delete a restriction in the second letter of credit which had prevented Iravani from drawing on it until the first credit was exhausted.

To ease his financial difficulties, Iravani made two suggestions to BIC through Valensi. On June 15, 1950 he cabled "as losses unsupportable arrange Barkey accept half all future shipments against contracts and half to sell our account." (This arrangement later came to be known as the "half-half agreement.") On June 21, 1950 BIC's agent, Kitching, cabled that Iravani intended to allocate the shipments against the contracts "half at sixty [i.e., against the First Contract] half at seventy [i.e., against the Second Contract]" and that Iravani contemplated completing the contracts within 30 days. Whether or not these proposals were acceptable to BIC at the time is not clear. Certainly BIC's final accounting, Exhibit QQ, suggests that it did not accede to the second proposal about allocation of contract shipments and this has some support in some ambiguous statements made in August by Kitching to Iravani. The district court, however, apparently agreed with Iravani to some extent, since it found for Iravani on the second cause of action in which he claimed that shipments on voyages #2, #4 and #9 were applicable to the Second Contract.[6] As to the proposal for allocating the shipments half against contracts and half on consignment—the "half-half" agreement—the district court found that BIC acceded to this on or about September 28, 1950, contrary to BIC's accounting. See the discussion of the fourth cause of action, *infra*.

Despite BIC's annoyance with Iravani's delays and suggestions for revision of the first three contracts, he entered into a fourth contract with Iravani on June 30, 1950 which was "contingent upon you [Iravani] completing your present out-

---

5. No over-all accounting for all shipments on all ships was made by the district court. Iravani did not provide any and BIC's was found to be not wholly reliable. As to many items, we have therefore had to make many computations from such figures as appear in the record; many of the figures which appear in our opinion are therefore approximations only, derived from conflicting evidence in the record.

This lack of an over-all accounting made analysis of the various conclusions especially troublesome. On remand the district court may find it helpful to compute such an accounting.

6. Despite this, the district court later stated that it agreed with BIC that when Iravani arrived in this country he owed 44,639 pounds on the First Contract, a figure which was based on BIC's accounting, Exhibit QQ, in which all shipments of white wool on voyages ##1–11 were allocated to the First Contract only. This inconsistency could have been avoided had an over-all accounting been prepared.

standing contracts with us" for 200 tons of greasy white wool at 85 cents per net clean pound, and 200 tons of greasy cream wool at 75 cents per net clean pound.

This completes the June transactions, except for one 142 bale shipment allegedly on consignment which underlies the third cause of action. The court tentatively found for Iravani and no appeal from that part of the decision is taken.

The S. S. Laagkerk/Westerdam and the S. S. Steel Apprentice (voyages #5 and #6), sailed in July, carrying approximately 21 and 124 tons respectively. The claimed allocations among the contracts on this as on the other shipments differs sharply.

The market in both the United States and Iran continued to rise rapidly especially because of the Korean war. The correspondence again indicates BIC's annoyance with Iravani, Iravani's explanations for delay and his requests that BIC open a letter of credit on the Fourth Contract immediately. Valensi also rebuked Iravani for his delays and requests for alternate and additional arrangements. At this time, however, Iravani expressed willingness to surrender documents for 27 of the 144 to 149 tons shipped on the Lemsterkerk/Westerdam (voyage #2) which arrived in New York on July 17, 1950 against which 27 tons BIC paid $17,000. This 27 tons is part of the second cause of action on the Second Contract in which Iravani claims 70 cents per pound. The district court found for Iravani and this implies that the parties did agree that at least some of the shipments were to be divided, at least among the first two contracts.

In July the Steel Designer (voyage #3) also arrived carrying from 86 to 88 tons, of which 32 are asserted by Iravani to be allocable to the Second Contract. Also in July the S. S. Laagkerk/Westerdam (voyage #4) carrying approximately 21 tons and the S. S. Steel Apprentice (voyage #5) carrying from 124 to 130 tons sailed, and both arrived in New York in September 1950.

Summary of first seven months.

To summarize briefly the events through July 1950: The parties had made four contracts calling ultimately for a total of 1,140 tons, and more than 305 had arrived, although the allocation of these shipments is in dispute. The wool market had started to rise by July and Iravani sought concessions involving irregular—i.e., non-chronological—allocation, and side arrangements for particular amounts of wool as well as additional financial assistance. BIC did agree to some financial assistance.

On August 1, 1950 Kitching notified BIC that he had the documents for 32 tons of white wool shipped aboard the Steel Apprentice (voyage #5) which had left in July, see supra, for which he recommended Barkey pay $20,000 to various people in New York for Iravani's account. This payment was to be at the rate of 70 cents per clean pound. BIC complied with this immediately. This same procedure, involving "Twentytwo Tons White Seventy Cents And Seventysix Tons Cream Sixty Cents All Steel Apprentice" [7] was followed again in August and BIC paid one Murad $35,000 for Iravani's account, as Iravani requested. Here again, as on all shipments of white wool until January 1951, BIC allocated the white wool to the First Contract at 60 cents. Because the cream requirements of the First Contract had already been met, BIC allocated the 76 tons of cream wool in this shipment to the Third Contract, also at 60 cents for cream. These 54 tons of white wool are involved in the second cause of action on the Second Contract.

Also in August, four more ships left Iran carrying wool from Iravani to BIC. On August 5 the S. S. Lindekerk/Arkeldyk (voyage #6), sailed for New York, apparently carrying 27 tons white wool and 5 tons cream and arrived on November 2. As to this, Kitching reported to BIC in August that he had the documents in hand for the "27 tons white Lindekerk *seventy* cents." [Emphasis added.] BIC ultimately credited this also to the First Contract at 60 cents. These 27 tons also

---

7. Radiogram from Kitching to BIC, dated August 9, 1950. 134 F.Supp. at page 735.

constitute a part of the second cause of action on the Second Contract.

The Lindekerk/Averdyk (voyage #7) also sailed on August 5, carrying 47 tons, all of which Iravani allocated to the First Contract, but at 70 cents (see the first cause of action, *infra*), whereas BIC allocated the tonnage as follows: 14 tons of white wool to the First Contract at 60 cents, 18 tons of cream wool to the Fourth Contract, and 15 tons of colored wool allocable to none of the contracts.

On August 19 the S. S. Lissekerk/Alblasserdyk sailed (voyage #8) but from the record it is very difficult to ascertain the total tonnage shipped on this voyage. BIC applied 21.5 white tons of this shipment to the First Contract; Iravani's allocation was to the Second Contract and to other arrangements to be noted *infra*.

The last August shipments were on the Steel Artisan (Voyage #9) which left Iran on August 24 and arrived in New York on October 4, with a relatively small shipment, the exact size of which is not clear from the record. Iravani claimed that this shipment was governed by the half-half agreement, and the second and fourth causes of action relate in part to this shipment. BIC denied this and allocated the wools among the First and Fourth Contracts.

In August, BIC cabled its agreement to allocate shipments between the First and Second Contracts. In addition, Iravani proposed that BIC accept the balance of the documents for the Lemsterkerk/Westerdam (voyage #2), the Steel Designer (voyage #3), and the Lindekerk/Averdyk (voyage #7) shipments against the letter of credit for the First Contract at 70 cents white and 42 cents color. BIC agreed and subsequently paid a draft for these shipments and for some on the Laagkerk/Westerdam (voyage #4). In its accounts BIC credited Iravani at only 60 cents for the white, and the alleged 10 cent underpayment on the four shipments constitutes the basis for the first cause of action.

Iravani also asked that the letter of credit for the Fourth Contract be opened regardless of the incompleteness on the first two contracts, to which BIC much later ultimately agreed.

In September 1950 the Laagkerk/Westerdam and Steel Apprentice (voyages #4 and #5) arrived in New York. In early September Iravani admitted owing 650 tons of wool to BIC but declared that the only way he could avoid suffering an "unbearable loss" was to allocate the "unnegotiated shipments, stocks and purchases" shipped on the Lissekerk (voyage #8), Lindekerk (voyage #6 or #7) and Artisan (voyage #9), then in transit, and 260 other tons, available but not yet shipped, half against the contracts and half on consignment. This is the proposal for the half-and-half agreement which is involved in the second cause of action and is the basis for the fourth. 80 tons of these shipments were conceded by Iravani to be outside the scope of this agreement. On September 14, 1950, Iravani cabled he was shipping 250 tons "half against contract and half for sale at present prices. In this manner hope to complete all contracts end November." At first, Valensi said BIC would not accept this in part because BIC claimed that it did not do business on commission. The district court found that such an agreement was made on September 23, 1950, that it was limited to the Steel Designer and future shipments, that "future shipments" meant shipments not yet afloat, rather than shipments afloat but not yet arrived or whose documents had not yet been negotiated. BIC subsequently argued that this agreement although made, never went into effect, and indeed, its own allocation takes no account of it, crediting all of the white tonnage to the First Contract, following strict chronological order, as noted supra.

At this time also, Iravani sought to have a draft of $114,257 on the first letter of credit and $15,000 in cash paid to Murad. BIC paid the $15,000 but postponed payment of this draft.

In October, the Lissekerk/Alblasserdyk (voyage #8), Lindekerk/Arkeldyk (voyage #6) and Steel Artisan (voyage #9) arrived in New York. BIC finally

agreed to modify the fourth letter of credit for Iravani thereby making it immediately available, rather than upon the completion of the first three contracts.

In November the Steel Apprentice (voyage #11) left for New York, arriving in January 1951 with approximately 210 tons of white and cream wool. Iravani asked that $30,000 be paid to Murad to which BIC agreed, because "of the very high balances and equity which you now have here in New York." Iravani also requested BIC to finance additional consignment business which BIC refused to do until all the contracts had been completed. Valensi and BIC urged Iravani to come to New York to "effect compromise settlement 400 ton contract" after the 175 ton shipment on the Steel Apprentice. BIC's cable seems to indicate this would involve only the 400 ton Fourth Contract, although according to its own calculations, no shipments under the Second Contract had yet been received. In reply to the invitation to come to New York, Iravani promised to fly to New York in December, but because of visa trouble, he did not arrive until January 28, 1951.

On November 10, Valensi wrote Iravani that the wools were being charged off to the contracts in chronological order, "as a matter of expediency," and he repeated this on January 5, 1951, stating "contrary to your understanding Barkey will not accept one-half of these wools under contract and sell the other one-half for your account at current market prices * * * Barkey will attempt to seek full satisfaction on all contracts with whatever wools you ship." Iravani replied to Valensi's November 10 letter, and after receiving BIC's accountings Iravani complained that BIC had calculated at 60 cents wool drawn by Iravani at 70 cents and declared "we therefore cannot understand why Mr. Barkey has now calculated them at 60 cents * * * reduc[ing] the price to 60 cents for those shipments against which he has already paid us at 70 cents * * * His insistence that we should complete our contracts at 60 cents at 70 cents, while we are paying twice that amount here, would simply

mean * * * running headlong into bankruptcy." According to his testimony however, Iravani was not complaining about the chronological allocation but only about the 60 cent credit for wool agreed to be at 70 cents, although allocable to the First Contract. We find no record of any response to this until Valensi's January 5 letter noted above.

In December Iravani again asked for consignment financing and BIC evidently agreed to finance 200 tons as 75 cents per net clean pound. On December 31 the Steel Artisan (voyage #12) left Iran for New York carrying approximately 220 tons, of which 75 had been sold by Iravani to other buyers.

The Steel Apprentice arrived January 4, 1951 and BIC credited 9 of its 44 white tons to the Second Contract, the other 35 having been applied to completing the First Contract according to BIC's accounting. Iravani arrived in New York on the 28th.

Before Iravani's arrival, he cabled that he had shipped 220 tons on the Steel Artisan, of which 75 were committed to others. He also cabled he had 250 additional tons which he wanted BIC to sell for his account. BIC cabled back that it would "do utmost your behalf." Valensi wrote Iravani that this reply seemed very enigmatic to him. Iravani at any rate apparently expected BIC to handle all 395 tons (145 on the Steel Artisan plus the additional 250) on a consignment basis and this alleged consignment constitutes the fifth and sixth causes of action. At this time, Iravani also asked BIC to deliver $90,000 to Iravani's agents in New York and to open a letter of credit for $200,000, with both of which BIC complied, reiterating "again assure you our utmost cooperation." This letter of credit was opened against the 250 tons. Valensi subsequently cabled Iravani on January 13, 1951 that the 250 tons had been sold by BIC "However prices adnd [sic] whether sale for your account left hundetermined [sic]."

BIC claimed that at this time it needed 450 tons to complete his own contracts, excluding the 145 tons from the Steel Artisan. Julius Lavis, the Secretary of

BIC, also testified that before the Steel Artisan arrived in February, Iravani owed 523 tons on the outstanding contracts: 258 tons of white on the second contract, 200 tons of white on the fourth and 65 tons of cream on the fourth.

By January 28, when Iravani arrived in New York, he had delivered approximately 850 tons to BIC, and thought that BIC had agreed to the half-half proposal further modified by division of contract shipments between the First and Second Contracts. The shipments had resulted in completing at least the First and Third Contracts. Iravani also claims he completed the Second Contract by this time and had a large amount on consignment under the half-half agreement, and the colored wool consignments. The accounts between the parties were sharply disputed, as they had been almost from the beginning of their relationship.

On February 4, 1951, the Steel Artisan (voyage #12) arrived carrying 220 tons of Iravani's wool of which 145 was for BIC. BIC claims it obtained only 120 tons of this shipment. This will be discussed in the analysis of the sixth cause of action. In the shipment which arrived on the Steel Artisan, there was a 292 bale lot which Iravani claimed was to be sold for his account together with the rest. BIC denies that these 292 bales were to be on consignment and indeed denies that Iravani had any right to the wool at all. This claim is the basis for the fifth cause of action, and since it is largely separable from the other events, we shall defer full description until the analysis of that cause of action.

After his arrival in New York, Iravani presented two drafts to BIC for payment, one for $114,071.31 already referred to, and the other for $316,010.88. BIC claims it refused to pay them because Iravani did not have enough credits to cover them. BIC claims that about February 20 or 22 Iravani and BIC arrived at a settlement of the differences between them which would get Iravani out of trouble and that BIC then paid the drafts. Iravani claimed that the settlement occurred in March, and this is supported by Lavis' testimony. The district court found that the settlement occurred on or about March 7, 1951. The settlement terms were never put in writing. Briefly, the two versions are as follows:

Iravani: He was to ship 150 tons of white wool at $1.25 per pound; the half-half agreement and four written contracts as amended were to remain in effect so far as already executed and cancelled to the extent that Iravani still owed wool under them; the 395 ton consignment with a 5% commission for BIC still remained in effect; other future shipments would be handled on a joint venture basis.

BIC: Iravani was to ship 150 tons of white wool at $1.10 per pound; the half-half agreement was to be set aside; Iravani was to get BIC's prices from his customers less 5% for all wools shipped in order to complete the Second Contract and after; and the Fourth Contract was to be cancelled.

The district court upheld BIC's version as to all the terms, and found further that any claims Iravani had under the first four contracts were also discharged by the settlement.

To anticipate a bit, Iravani further claims that in June 1951, the 150 ton agreement was changed to 120 tons at $150,000 of which BIC accepted only 80, refusing to accept 40 in September. BIC denies the modification and claims that the full 150 were received and that he refused to accept the 40 excess because he no longer wanted to do business with Iravani. There is testimony by both Barkey and Murad that Barkey was at first willing to pay $37,000 for the 40 tons, whereas Murad, acting on Iravani's behalf, asked for $40,000. The wool market had fallen by then.

On March 20, 1951 a wire was sent by the Irving Trust Co. to Bank Melli in Iran stating "Barkey * * * requests us cable you it will * * * pay drafts for * * * wool shipments steamers Steelworker Alamak Laurenkerk [which had left Iran by this time] on following

basis one third quantity white and cream dollars one point two five per pound two thirds dollars one point sixty and colors dollars one." Iravani relies heavily on this cable to support his version of the settlement as being at $1.25 per pound for 150 tons, rather than $1.10.

There is no dispute that from and after the arrival of the Steel Artisan (voyage #12) on February 4, 1951, a total of 619 tons was shipped. Iravani claims that of this amount 395 tons was on consignment (see the sixth cause of action) and 70 tons was on a joint venture basis (see the seventh and eighth causes of action).

As to this alleged joint venture, Iravani claims that two letters of credit were opened—one for $300,000 and one for $100,000. Iravani testified that he did not draw against the $300,000 for the joint venture although he admitted that he did draw against it to the extent of $208,830.55, for shipments of which all but one were not under the joint venture agreement. The $100,000 letter of credit was used up almost entirely, allegedly for the 70 tons.

## II. Scope of Review

■ The issues before us, with but a few exceptions, are largely factual, and as the district court was trying the facts without a jury, its "findings of fact shall not be set aside unless clearly erroneous." Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. But the words "clearly erroneous" do not have a fixed meaning; their content varies with the nature of the evidence. See Gindorff v. Prince, 2 Cir., 1951, 189 F.2d 897. Ultimately, the rule is always this: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U. S. Gypsum Co., 1948, 333 U.S. 364, 395, 869, 68 S.Ct. 525, 542, 788, 92 L.Ed. 1147.

■ Turning to the evidence before us in this case, it is clear that for his conclusions the trial judge relied almost exclusively on inferences drawn from documentary evidence and undisputed facts. See e.g., 134 F.Supp. at page 730.[8] The oral testimony was rarely relied on, except for such admissions as were made and for ascertaining the intentions of the parties. There was ample justification for this treatment of the evidence in the many inconsistencies and confusions in the testimony offered by both sides. See 134 F.Supp. at page 724. Under such circumstances, we are in as good a position as the district court to evaluate the evidence.

## III. Analysis of Individual Causes of Action

In analyzing the causes of action, we shall first set out in a footnote the ten

8. We set out here briefly, the crucial pieces of evidence on which the trial judge principally relied for his conclusion as to each cause of action. Of course in the analysis of the separate causes of action, *infra*, the evidence and inferences will be examined more thoroughly.

First cause of action: Correspondence in facts #1–26 through #1–28. 134 F. Supp. at pages 729, 727.

Second cause of action: Correspondence in facts #2–27, #2–28, #2–34 and #2–35. 134 F.Supp. at pages 744, 734, 735.

Third cause of action: Written communications and computations, 134 F. Supp. at pages 750–51, 748, 749.

Fourth cause of action: Correspondence (facts #4–8 and #4–9). 134 F. Supp. at pages 759, 753.

Fifth cause of action: The issue is purely one of law.

Sixth cause of action: Undisputed facts and computations. 134 F.Supp. at pages 783–784.

Seventh and eighth causes of action: The use of a $300,000 letter of credit. 134 F.Supp. at page 793.

Ninth cause of action: Not sufficient proof shown. 134 F.Supp. at page 794.

Tenth cause of action: Disparity between dates of contract and of the settlement agreement. 134 F.Supp. at pages 801–802, 781.

Where the documentary evidence and undisputed facts were inconclusive, the district court held that plaintiff had not sustained his burden.

causes of action involved in this suit, the parties' contentions as to each, and the district court's disposition, both tentative and final.[9]

9.

| Cause of Action | Iravani's Contention | BIC's Defense | District Court's Disposition |
|---|---|---|---|
| 1. | The parties agreed to change the price of shipments under the First Contract on voyages #2, 3, 4, 7, from 60 cents to 70 cents per pound. | Denied | BIC owed Iravani for shipments on voyages #2, 3, 7, in the sum of $6,790.28, 134 F. Supp. at page 730, but whatever was due Iravani was discharged by the settlement of March 1951. |
| 2. | Shipments aboard Lemsterkerk/ Westerdam (voyage #2); Steel Designer (voyage #3); Steel Apprentice (voyage #5); Lindekerk/Arkeldyk (voyage #6); were allocable to second contract at 70 cents; shipments aboard Lissekerk/ Alblasserdyk (voyage #8); Steel Artisan (voyage #9); Steel Designer (voyage #10); and Steel Apprentice (voyage #11) are part of half-half agreement and are also allocable to second contract. | Denied | BIC owed Iravani for shipments on voyages #2, 5, 6, in the sum of $10,548.85, 134 F.Supp. at page 746, but whatever was due Iravani was ultimately discharged by the settlement. |
| 3. | 142 bales were shipped on consignment, sold at 91 cents but BIC credited them to Iravani at only 85 cents and 75 cents for white and cream respectively. | Denied. The wools were sold to BIC at 85 cents and 75 cents. | BIC owed Iravani the sum of $1,145.24, 134 F. Supp. at page 751, but this was ultimately discharged by the settlement.* |
| 4. | Shipments aboard Lissekerk/ Alblasserdyk (voyage #8); Steel Artisan (voyage #9); Steel Designer (voyage #10) and Steel Apprentice (voyage #11) are on consignment, | Although a half-half agreement existed, it never went into effect and all these shipments are allocable to the first contract at 60 cents. Moreover, in the | The half-half agreement existed and went into effect as to the shipments aboard the Steel Designer (voyage #10) and the Steel Apprentice (voyage #11). Iravani therefore has a right to |

* On this issue Iravani appeals only the conclusion that the settlement wiped out his claim to the $1,145.24.

*First Cause of Action*

In his first cause of action, Iravani alleges that in August 1950 the First Contract was modified to provide a 60 cent figure for mixed white and colored, derived from an average of 70 cents for white and 42 cents for colored. This allegedly applied to certain ship-

| | | | |
|---|---|---|---|
| | pursuant to half-half agreement. | settlement the half-half agreement was set aside *ab initio*. | $73,071.94, 134 F. Supp. at page 762, which however, was discharged by the settlement agreement. |
| 5. | 292 bales on Steel Artisan (voyage #12) were sold for Iravani's account and Iravani was entitled to proceeds, in the net amount of $43,119.91. | Denied. Iravani never owned this wool and when BIC purchased it, it was for BIC's own account and Iravani was not entitled to anything. | BIC owed nothing because Iravani failed to disclose that one of his checks in payment of the wool had been returned by the bank, thereby perpetrating a fraud on BIC. |
| 6. | BIC agreed to take 395 tons on consignment to be sold at best January prices. BIC nevertheless applied some of these to its old contracts at prices much lower than best January, as well as to the 150 ton settlement at $1.10. | No consignment. Iravani was entitled only to whatever BIC sold the wools for, less 5% as to most wools and $1.10 as to some 150 tons. | For BIC, because Iravani got best January prices on all that he was entitled to. |
| 7. and 8. | Iravani and BIC agreed on a joint venture which applied to 70 tons. BIC however credited Iravani with only $1.10 on these wools. Also Iravani purchased wools on reliance on joint venture and lost money thereon. | No joint venture. | For BIC. There was no joint venture. |
| 9. | BIC improperly returned money to a BIC customer when some of the wools shipped turned out to be colored. | The allowance was proper. | For BIC. |
| 10. | Under original settlement, Iravani entitled to $1.25 per pound for 150 tons; by agreement | The settlement was for 150 tons at $1.10 per pound and there was no | For BIC on all issues as to the terms and performance of the settlement. |

ments on the Lemsterkerk/Westerdam (voyage #2); the Steel Designer (voyage #3); the Laagkerk/Westerdam (voyage #4); the Lindekerk/Averdyk (voyage #7). BIC accounted for all these shipments at only 60 cents for white wool. The district court, relying on the correspondence noted on page 10, supra, held that such an averaging agreement had been arrived at but that it did not cover shipments aboard the Laagkerk/Westerdam since the cable of August 23, 1950 did not mention that. 134 F.Supp. at page 729. The district court therefore found that on these shipments, BIC had underpaid Iravani $6,790.28.

Appealing from the finding as to the Laagkerk/Westerdam, Iravani claims that the "bill," invoices and draft presented to BIC and paid by it in February 1951, refer to all four shipments at the 60 cent average, and that this proves all four were covered by this modification. We do not find this joinder of the four shipments on one document sufficiently persuasive to reverse the district court's judgment. Nor do we find that Iravani's reference to New York Personal Property Law, McKinney's Consol.Laws, c. 41, § 196 is relevant, for that deals with the consignor's binding himself to the terms of a bill of lading which he accepts, and there is no evidence that BIC accepted a bill of lading for the Laagkerk/Westerdam.

The district court, however, concluded that the settlement agreement discharged BIC's debt to Iravani. As will be explained, *infra*, we disagree with this conclusion and therefore direct that in the final accounting of moneys due between the parties Iravani's claim on this cause of action for $6,790.28 be reinstated.

*Second Cause of Action*

This cause of action involves eight shipments, all allegedly applicable to the Second Contract at 70 cents per pound.

The first four were shipments allegedly under a straight delivery pursuant to the Second Contract, and were on: (1) the Lemsterkerk/Westerdam (voyage #2); (2) the Steel Designer (voyage #3); (3) the Steel Apprentice (voyage #5); (4) the Lindekerk/Arkeldyk (voyage #6).

| | | | |
|---|---|---|---|
| | this was changed to $150,000 for 120 tons of which BIC took delivery of only 80, refusing to take delivery of the rest. | modification to 120 tons at $150,000; all 150 tons were received. | |
| Gums | BIC wrongfully holding Iravani's property. | Property is Iravani's, but held as security for loans to Iravani. | Although the gums are Iravani's, his rights to them might well be affected by the judgment entered for BIC. |
| | *BIC's Contention* | *Iravani's Defense* | |
| Counterclaim | Barkey paid out $139,723.31 more than Iravani was entitled to. | Admits propriety of such a deduction from any recovery, although this admission retracted on appeal. | For BIC, since it is admitted by Iravani. |

The later four shipments are alleged to be applicable to the Second Contract under the half-half agreement and were on: (1) the Lissekerk/Alblasserdyk (voyage #8); (2) the Steel Artisan (voyage #9); (3) the Steel Designer (voyage #10); (4) the Steel Apprentice (voyage #11).

BIC credited all of these shipments to the First Contract at 60·cents.

The district court found as to the first four shipments that Iravani had sustained his burden of proving that by agreement of the parties, three of them—all but the Steel Designer—were allocable to the Second Contract and that BIC underpaid Iravani $10,545.85 on these claims. 134 F.Supp. at page 746.

In support of his claim that the Steel Designer shipment was also at 70 cents, Iravani relies on his own invoice dated July 6, 1950, the claim that BIC's agent, Kitching, authorized this and forwarded it, and the fact that on June 23, 1950 BIC paid Iravani $20,000 through one Shimo, whereas if 60 cents were the correct price the amount due Iravani would have totaled only $17,222.40. Moreover, BIC's own copy of its letter to Kitching, apparently in reference to the Steel Designer shipment, states: "We authorized Randy to tell Iravani that he may draw an open draft of $20,-000 only if he turns over to you negotiable bills of lading covering shipment of 30 tons white wool, documents in good order." Next to this there is a pencilled notation: "St. Designer Billed by Iravani at 70 cents Pd to Shimo."

The district court evidently concluded that Iravani had not presented sufficient evidence to support his claim as to the Steel Designer shipment. Looking only to the documentary evidence in the record before us, we are constrained to reverse on this issue. We find the cables, letters, and notations noted in the immediately preceding paragraph sufficient to establish the validity of Iravani's claim. The most important items are the reference in the letter to $20,000 and the pencilled notation thereon referring to the $20,000 payment to Shimo

and the 70 cents. Iravani is therefore entitled to an additional 10 cents per pound or $2,870.40 on this cause of action.

The district court, however, held that the settlement agreement discharged Iravani's claim and since we disagree with this we hold that the amount in favor of Iravani must be reinstated.

As to the shipments allegedly under the half-half agreement, the trial court found none of the four allocable to the Second Contract. The district court found, in its analysis of the fourth cause of action, that this half-half agreement had been made in September and the parties do not now dispute this. The district court concluded, however, that Iravani had not sustained his burden in proving that these shipments were allocable to the Second Contract because the only supporting evidence, according to the court, was a. self-serving letter and a draft which was paid after the settlement. The court therefore concluded that these shipments were correctly allocated by BIC to the First Contract.

Iravani's main contention seems to be that at the time these shipments arrived, the First Contract was already completed. But this is clearly wrong. In the first place, of the tonnage he uses to support his claim, a good percentage is admittedly colored wool. In the second place, at the trial Iravani admitted owing wool on the First Contract and that he never did complete it. He does present some additional evidence which the district court did not consider very persuasive, and we agree with the district court.

We therefore conclude that on this cause of action, BIC owes Iravani $13,-416.25 ($10,545.85 plus $2,870.40).

*Third Cause of Action*

The district court found that on the 142 bale consignment BIC owed Iravani $1,145.24 and no appeal is taken from that. Here, also, the district court held the settlement eliminated BIC's obligation and for reasons already stated we

hold that Iravani is entitled to recover $1,145.24.

*Fourth Cause of Action*

█ This involves the half-half agreement under which, according to Iravani, BIC agreed to sell on consignment half of certain shipments. See causes of action 2 and 4, at page 249 of 244 F.2d note 9, supra. The district court found that such an agreement was made on September 23, 1950, that it was limited to the Steel Designer and future shipments, that "future shipments" meant shipments not yet afloat, rather than shipments afloat but not yet arrived or whose documents had not yet been negotiated and that BIC owed Iravani $73,-071.94. The district court held, however, that the settlement had discharged BIC's obligation on this claim as well.

There is very little evidence on this claim and we see no reason to disturb the district court's original conclusion. However, as on the other three causes of action, we do not agree that the record supports a finding that BIC's obligation was discharged by the settlement, and we reinstate the original finding in favor of Iravani.

*Fifth Cause of Action*

Iravani claims that a 292 bale shipment aboard the Steel Artisan, arriving in February 1951, was part of an agreement by BIC to sell 395 tons for Iravani's account, and that Iravani is entitled to $43,119.91 from the sale of this wool for which BIC never accounted. BIC claims that Iravani never had title to these wools, that BIC purchased them from an independent third party, and that it therefore had no duty to account to Iravani.

In November 1950 Iravani contracted to buy from one Desfouli, manager of Sherkat Jenoob who was agent for the owner, Bijarchi, 54 tons of wool for something in excess of 3,000,000 rials.[10] Iravani paid 300,000 rials down and later gave Desfouli two checks for 100,000 rials and 50,000 rials. The 100,000 rial check was returned by Iravani's bank with a note "Refer to Drawer." Bijarchi shipped the goods and sent the bills of lading to Murad, but this time not for Iravani's account. Bijarchi later declared that Iravani had failed to comply with the contract or sale and had no right to the wool.

On the assumption that Iravani had a valid title, BIC took delivery of the wool on or about February 5 by posting a letter of guaranty on Iravani's assurance that the title documents would follow. Shortly after February 14, 1951, Jacob Barkey, BIC's president, Murad and Iravani conferred at BIC's office, at which time Murad asserted Bijarchi's title and Barkey asserted Iravani's. Barkey testified that Iravani never told BIC about the returned check for 100,000 rials.

Iravani claimed that this wool was on consignment; BIC claimed that the wool was to be applied against the unfinished contracts at the price specified in the March settlement, and on BIC's books Iravani was originally credited in June 1951 with the price for which BIC sold the wool less 5%.

Ultimately, BIC itself bought the documents in November 1952 for $51,000 which was equivalent to the original price to Iravani.

The district court stated that if this were a consignment, the usual rule that an agent may not question his principal's title would preclude BIC from taking the shipment for its own account. See Restatement, Agency § 417. But the court believed Jacob Barkey's testimony that Iravani did not tell him about the returned check and held that this concealment operated as a fraud on BIC. The court said:

" * * * regardless of the question of agency, the failure of Iravani to reveal all of the pertinent facts to Barkey before Barkey took possession of the goods amounted to fraud on his part. We further conclude that this fraud in inducing

10. At the rate of exchange then applicable, 1 rial was worth 2 cents. The 100,000 rial check was therefore worth $2,000.

Barkey to take possession of the goods without his (Iravani) being able to convey good title to them, and thereby placing Barkey in a position where they eventually would have to buy the documents, was of such magnitude as to preclude Iravani's recovery on this cause of action." 134 F.Supp. at page 768.

■ The district court's theory seems to be that had BIC known of the returned check, it would not have taken delivery of the wools. It would then not have sold the goods and been forced to buy the documents to protect itself. But we fail to see where this deception, if any, harmed BIC. It did not learn of the check until November 13, 1952. By that time, it had sold—at a very substantial profit— the goods obtained because of Iravani's claim of title. Its purchase of the documents assuring such a profit can hardly be considered as a mere defensive move caused by Iravani's fraud. Moreover, we doubt that BIC's conduct would have been changed by knowledge of the check. It knew of a title dispute both before and after it took delivery of the goods and sold them. Cf. King v. Kaiser, Cty. Ct.1893, 3 Misc. 523, 23 N.Y.S. 21. Since it was not dissuaded by that, it is difficult to believe that the return of this 100,000 rial check would have induced BIC to refuse or return the shipment.

■ In any event, because we see no harm to BIC resulting from Iravani's failure to inform BIC about the return of the check, we reverse and remand for a finding as to whether these goods were shipped on consignment. If they were, then BIC is estopped from questioning Iravani's title and must account. If they were not on consignment, then the district court will have to consider whether under the applicable law either Iravani's interest in these goods, or the relations between the parties, was sufficient to require BIC to account to him regardless of consignment.

*Sixth, Seventh, Eighth and Tenth Causes of Action*

These all turn directly or indirectly on the proper disposition of the settlement

which the district court found took place on March 7, 1951. On all of these causes of action the district court found for BIC; moreover, it concluded that:

"Inasmuch as the first three causes of action involve disputes that were out in the open before the settlement arrangement was reached, it does not seem likely to this court that these disputes would not have been disposed of by the final settlement. * * * This decision, therefore, disposes of all claims the plaintiff has asserted in his first, second, third, fourth and sixth causes of action as well." 134 F.Supp. at page 802.

No memoranda of this settlement was made by either Iravani or BIC and each offers a different version.

Iravani testified that the terms of the settlement were as follows:

1. All the original contracts, to the extent they were still unfulfilled, were rescinded.

2. The half-half agreement was confirmed as to those shipments already made under it, and rescinded as to any future shipments.

3. The 395 tons were to be sold by BIC on consignment at best January prices, as originally agreed upon.

4. Iravani was to ship 150 tons at $1.25, in consideration for BIC's releasing him from his obligation to fulfill the balance of the first four contracts.

5. Iravani and BIC were to handle all other future shipments on a joint venture basis.

Jacob Barkey testified as follows:

1. The Second Contract was to be completed. However, this was not at 70 cents per pound but at billed prices less 5%—i.e., the prices at which BIC sold the wool to its customers less 5%. All other shipments except for 150 tons at $1.10 were also to be at billed prices less 5%.

2. The Fourth Contract, to the extent it was unfulfilled, was to be rescinded.

3. The half-half agreement was to be set aside *ab initio*.

4. Iravani was to sell an additional 150 tons of white wool to BIC at $1.10 per pound, although Iravani originally asked for $1.25 per pound.

The district court accepted BIC's version of all phases of the settlement.

*Sixth Cause of Action*

Iravani contends that he and BIC agreed that 395 tons were to be sold by BIC on a consignment basis at best January prices, but that as to 11 shipments (referred to as items #1–11 by the district court), he received less than that. BIC denied the existence of such a consignment basis. It credited these shipments as follows: The last of these shipments, which was approximately 23 tons, BIC credited at $1.10 in satisfaction of the 150 ton settlement; items 1, 2, 3 and 8 BIC applied to old contracts of his own and credited Iravani with those prices less 5%, rather than best January prices; the allocation of items 5, 6 and 9 were not explained; items 4, 7 and 10 consisted of cream wool which were credited at $1.35, the January price for grey wool, whereas Iravani claims they should have been credited at $1.55, the January price for light cream wool.

The district court took an indirect approach to the differing contentions. It did not decide the issue of the existence of a consignment agreement, although it did note that it seemed probable "that Barkey did agree to accept certain goods on consignment for Iravani." 134 F. Supp. at page 782. Instead, it first established as virtually undisputed that 619 tons of wool had been delivered from and after the arrival of the Steel Artisan on February 4, 1951. It then deducted 148 tons as applicable to the settlement agreement, leaving 471 as yet unaccounted for. As to these 148 tons, the court found that the agreed price was $1.10 rather than $1.25, thus holding for BIC on this issue. The district court then noted Iravani had admitted at one point that BIC received only from 120 to 125 tons from the Steel Artisan, rather than 145 tons as originally claimed. This, according to the district court, reduced any consignment claim to 375 at most. Deducting this from the 471 tons, the court concluded that BIC could treat 96 tons as it saw fit, regardless of the existence of a consignment agreement. It then concluded that those items not paid for at best January prices—excluding the cream wools, but including 23 tons at $1.10— amounted to less than 96. It therefore concluded that "Iravani received 'best January prices' where he was entitled to them, and billed prices less 5% where they were proper." 134 F.Supp. at page 784. As to whether the cream wools were properly at light grey wool prices ($1.35) as BIC claimed, or at light cream prices ($1.55) as Iravani claimed, the district court held for BIC.

■ There is evidence in the record to support the district court's finding that cream is closer to light grey than to light cream, and that $1.35 is the appropriate price for the cream wool.

■ As to the other issues, however, we disagree with the district court. In the first place, the district court's conclusion that Iravani admitted that the alleged 145 tons on the Steel Artisan amounted to only 125 tons takes no account of Iravani's earlier statement that the other consignees for this shipment got nothing and, much more important, the fact that BIC's accounts indicate that 148.5 tons were obtained by them from the Steel Artisan. See Exh. RR. Therefore, we cannot agree that Iravani's claim should be reduced to 375 tons.

■ Moreover, we find it difficult to accept the district court's approach to the problem. Essentially, the district court identified the 96 tons which BIC could dispose of as it pleased with the shipments for which Iravani claimed underpayment. Nothing in the record justifies this identification and to conclude that "Iravani received 'best January prices' where he was entitled to them" is not supported by the record. The net ef-

fect is that the district court never really made any finding as to whether Iravani was underpaid on those specific shipments. We therefore reverse and remand for further consideration of this cause of action, which, as the issues are presently framed, will require a full accounting by the parties as to all the items involved.

We must point out, however, that in such an accounting, the burden of proof is of course on Iravani to show that on these shipments he was entitled to consignment prices. Of course if the district court is unable to find sufficient basis for deciding what the agreement of the parties was with respect to the items in dispute on this cause of action, Iravani would be entitled to a *qauntum meruit* recovery for such items for which the court should find that he had not been paid.

*Seventh and Eighth Causes of Action*

These two claims are based on a joint venture which Iravani alleges was part of the settlement agreement.

In his seventh cause of action, Iravani claims that he shipped 70 tons of white wool pursuant to the joint venture which BIC credited to Iravani at $1.10 only, when it should actually have allowed him half the profits derived from the sale of this wool.

In his eighth cause of action, Iravani alleges that in reliance on this agreement on a joint venture, he made contracts and laid out money for the purchase of wool, and that BIC's repudiation of this agreement damaged him to the extent of $93,-270. The district court concluded that although Iravani's evidence of a joint venture raised "certain inferences of its existence, this court does not believe he has sustained the burden of proof in that regard." It therefore held it unnecessary to examine the eighth cause of action in any detail and dismissed it.

The district court's conclusion was predicated almost entirely on one item. Iravani had stated that a $300,000 letter of credit had been opened by BIC to cover Iravani's purchases for the enterprise. However, the district court noted:

"Although Iravani testified that he did not draw against the $300,000 letter of credit, but rather requested the $100,000 letter which could be satisfied by inland bills of lading, [the $300,000 letter required ocean bills of lading] the $208,830.55 draft referred to in fact 7 & 8–30 is clearly drawn against the former credit. Furthermore, one of the shipments covered by the draft was the same as one allegedly made under the joint venture, while the other shipments were entirely different from those which Iravani alleges were made pursuant to the alleged joint venture.

"Barkey's explanation of the letters of credit being issued to cover other transactions is, therefore, the more probable of the two." 134 F. Supp. at page 793.

It is not clear whether the district court held against Iravani because it disbelieved him about drawing against the $300,000 letter of credit, thereby weakening his whole story of a joint venture, or whether the district court considered it highly improbable that the $300,000 letter of credit would be issued for one purpose and drawn upon for another. In either event, we find that the inference drawn by the district court is unjustified.

In the first place, it is clear that Iravani did admit using the $300,000 letter of credit, but not in connection with the joint venture. Secondly, we fail to see the crucial significance of this alleged "inconsistent" use of a letter of credit which was admittedly inappropriate for the purpose for which it was originally issued.

Moreover, we find the other evidence adduced by Iravani very persuasive. On March 8, 1951, Valensi made the following office memo:

"'Memorandum re: Future Business in Wool between Barkey and Iravani.

" 'This morning Jack Barkey called me by phone and subsequently I interviewed him in the presence of Mr. Iravani at his office concerning future business between Barkey and Iravani.

\* \* \* \* \* \*

" 'In reply to my inquiry concerning the modus operandi in which Mr. Barkey and Mr. Iravani would conduct their business Mr. Barkey indicated that it would probably assume the form of a profit sharing venture.' " 134 F.Supp. at page 785.

In addition, BIC itself cabled one of Iravani's suppliers directly, which Iravani claims he would not have allowed if the two were not partners. Furthermore, the letters of credit did not indicate who was to pay the freight, which Lavis admitted was most unusual, and according to Iravani, shows that freight, like all expenses and profits, was to be shared. Iravani also urges that the prices in his invoices were not per pound but rather per metric ton, and that these prices amount to approximately $1.37 per pound at about a 50% yield. BIC, through Lavis, claimed that the invoices were actually based on a higher percentage of yield, which resulted in reducing the per pound price to $1.10. From the cross-examination of Lavis, it seems rather clear that his percentage yield would have been an unusually high one to apply in estimating, and as to this point, Iravani's story seems more consistent with the other undisputed facts.

On the basis of this evidence, we think Iravani has sustained his burden of proof. Since we do not agree with the district court on the significance of the $300,000 letter of credit, we find nothing to rebut the inferences from Valensi's memorandum, and the unusual character of these letters of credit, with the omission of who was to pay freight. Moreover, Iravani's version of the per pound prices in the invoices seems more plausible than BIC's, in view of the unusually high yield estimate which is required in order to arrive at BIC's figure.

On the whole, we think Iravani has sufficiently proved the existence of a joint venture. He should therefore be credited with what he claims on the seventh cause of action, and in view of our decision, the district court must consider on remand the eighth cause of action.

*Tenth Cause of Action*

Iravani claims that the 150 tons of white wool in settlement was to be at $1.25 per pound, and that this was later modified to 120 tons for $150,000, or approximately $1.15 per pound. Moreover, he contends that BIC accepted only 80 tons—on which it underpaid him—and refused to accept 40 tons in September 1951 when the market had gone down to 80 cents per pound. BIC denies this completely. It contends that the 150 tons were at $1.10 per pound, there was no modification to 120 tons for $150,000, that it received all of the 150 tons, and that it refused the 40 tons because it had no desire to do any more business with Iravani. The district court held for BIC on all counts.

According to the district court, Iravani's "main prop" was the cable from the Irving Trust Co. to Bank Melli in Iran dated March 20, 1951: " 'Without Our Responsibility Barkey Importingco Requests Us Cable You Informing It Will Honor And Pay Your Drafts On Shafi Iravani For Eighty Five Percent Value Of Wool Shipments Steamers Steelworker Alamak Laurenskerk On Following Basis Onethird Quantity White And Cream Dollars Onepointtwofive Per Pound Twothirds Dollars One Pointsixty And Colors Dollars One. \* \* \*' " 134 F.Supp. at page 771.

Iravani testified that the $1.25 figure in the cable was a result of the settlement and to the court this seemed logical. The district court, however, went on to say:

" \* \* \* but he also asserts that the figure of $1.60 was arrived at by averaging the Bigelow and Smith prices. Yet the available evidence indicates that the settlement occurred on or about March 7, 1951 \* \* \* while the Alexander Smith

contract was not made until March 16th.

"Therefore, since Iravani cabled his office on March 7th, using the figures $1.25 and $1.60, the latter could hardly have been arrived at by any averaging-in of the Alexander Smith contract price.

"The cable by the Irving Trust Company dated March 20th, used the same figures as Iravani used in his cable of March 7th. Hence Barkey's explanation now seems the more probable of the two." 134 F.Supp. at pages 801–802.

On the basis of this reasoning as to the $1.60 figure, the district court rejected Iravani's claims as to the $1.25 figure. We cannot follow this reasoning.

In the first place, we do not see any necessary connection between the probability that the Smith contract price was not used in arriving at the $1.60 figure and the reliability of the $1.25 figure. There is no evidence that they were arrived at by similar methods and whether the $1.60 was arrived at by an averaging of the Bigelow and Smith contracts is logically irrelevant to the accuracy of the $1.25 price.

In the second place, even if there is some connection between the two figures, we agree with Iravani's argument that the fact that the Smith contract was dated nine days after the settlement agreement does not mean that its terms could not have been known or contemplated on March 7 when the settlement was agreed upon. The $1.60 figure might well have been based in part on the Smith contract and we cannot agree with the district court's judgment that "since Iravani cabled his office on March 7, using the figures of 1.25 and 1.60, the latter could hardly have been arrived at by any averaging-in of the Alexander Smith contract price." We therefore hold that the district court's first impression that $1.25 was the more probable price was the only correct one.

As to Iravani's claim of a verbal modification in June 1951 to 120 tons at $115,-000, and the shipment of only 80 tons, the district court said only "We do not believe that that has been borne out by the preponderance of the credible evidence in this case." Although we do not find this decision unwarranted, we think that it ought to be left open for further consideration in the light of further proceedings after remand on the other phases of the settlement and on an overall allocation.

In its discussion of the tenth cause of action, the district court went beyond these issues. It evidently thought it was not likely that Iravani's claims on the first four causes of action should not have been discharged by the settlement and the district court therefore concluded that they had been. After examining all the testimony and exhibits, we find no evidence of such an agreement by the parties. Nothing about such an agreement is to be found in Jacob Barkey's version of the settlement, and Iravani's version is directly contrary. We therefore reverse this conclusion for lack of supporting evidence, and as we have previously indicated, the judgment as to the first, second, third and fourth causes of action is reversed accordingly.

### Ninth Cause of Action

 This cause of action is largely independent of the rest. Part of the 395 tons on alleged consignment turned out to be colored and BIC made an allowance of $8,733.95 to Bigelow-Sanford. Iravani was not consulted on this and protests its payment. The district court held that it could "see nothing wrong in what appears to be an honest correction for an erroneous shipment of colored wool" and held for BIC. The record supports the conclusion of the district court and we affirm the disposition of this cause of action.

### The Counterclaim

 The defendant counterclaimed in two counts, asking $177,039.86 on the first count and $66,887.97 on the second. The first count was supported by Exhibit A, a Statement of Account rendered by BIC which covered both the wool

transactions which we have discussed and ten unrelated transactions involving BIC and Iravani. The Statement of Account claimed that the plaintiff owed the defendant $104,000 for the wool transactions and an additional $64,000 for the other ten deals. All but the last of the other dealings were itemized in "supplemental accounts" attached with Exhibit A to the counterclaim.

The plaintiff's reply contested the whole Statement of Account with minor exceptions, but at trial the plaintiff admitted the accuracy of the supplemental accounts. But Iravani never admitted the accuracy of the Statement of Account insofar as it concerned wool, and the trial court found that BIC's accounting was not a wholly accurate reflection of the agreement of the parties. We agree.

In the complaint as finally amended May 28, 1954, in a section titled "Summary of Claims" there appears the following:

"Fiftieth: That against the said amount claimed in paragraph Forty-ninth hereof by the plaintiff herein, the defendant is entitled to a credit for moneys which it advanced generally for the plaintiff's account in the sum of $133,736.14 and which defendant did not separately allocate to any of the causes of action herein, and which cannot be so allocated, and that the balance due plaintiff from defendant after deducting said sum from the aforesaid sum of $420,537.05, set forth in paragraph Forty-ninth hereof, is $286,800.91, which plaintiff claims herein."

A similar statement was made in plaintiff's brief submitted to the trial court.

On appeal, however, plaintiff vigorously contests the counterclaim judgment explaining that the "concessions in his complaint arose from his accountant's examination of data originating with Barkey. The said data showed the amount paid, but showed also that defendant failed to credit plaintiff with the proceeds of 292 bales of wool, gave plaintiff 60 cents for white wool when 70 cents should have been given, denied plaintiff credit for much wool sent on consignment, and failed to credit plaintiff with wool delivered under terms of a joint venture. Plaintiff sued defendant for the amounts represented by these various failures to credit, and conceded, as against them, the lesser balance owing to defendant, and claimed the difference of $282,780.81." [11] Appellant's Reply Brief, page 10. Lavis, an officer in BIC, had explained at trial the source of plaintiff's figure of $133,763.14: it was taken from Exhibit A, BIC's Statement of Account, with one change, *viz.*, the last item in the accounting involving collateral put up by BIC for Iravani in an attachment suit, an item of $27,000, was omitted from the total.

The district court rendered judgment on the counterclaim for the full amount, with an inconsequential arithmetic adjustment, and this is, as noted above, one of the grounds of Iravani's appeal. The district court's action amounted to a finding that the defendant's Statement of Account, with the last $27,000 item deducted, was an accurate reflection of the state of affairs between the parties as to both wool and other dealings. If it was not an accurate statement of account the court should not have rendered judgment on it even though the plaintiff admitted it, because a party's admissions are only evidence and not necessarily the truth. In giving judgment for the defendant on the Statement of Account the district court was inconsistent in that it took as admitted for purposes of the counterclaim the identical facts which were tried at length when they formed the basis of the main suit, and at the end of that trial it found, in a finding which we are affirming, that the defendant's Statement of Account did not represent the true state of affairs between the parties. We do not know whether plaintiff's admission was inadvertent or conditioned on a finding that defendant owed plaintiff $420,537.05 from which the conceded amount could be deducted, but in either event justice requires that we reverse

11. Changed to $286,800.91 in the complaint as finally amended.

and remand for further proceedings on the counterclaim also.

In sum, the judgment below is affirmed as to the ninth cause of action; the judgment is reversed as to the first, second, third and fourth causes of action, and the district court is directed to enter judgment for the plaintiff on these causes of action but only upon disposition of the entire controversy; the judgment is reversed as to the fifth, sixth, seventh, eighth and tenth causes of action, the counterclaim and the disposition of the gums, and the case is remanded to the district court for further proceedings thereon in conformity with this opinion.

On Petition for Rehearing.

PER CURIAM.

Nothing in the petition for rehearing persuades us that our original decision was in error. Both originally and on the petition for rehearing, we have carefully considered the support for the district court's findings, both tentative and final, and we see nothing in the petition or elsewhere to require any modification of our decision.

However, we do modify our opinion as to the fifth cause of action. Upon further consideration of the record, we note that BIC did learn of the returned check before trial. Nevertheless, we see nothing in that fact to disturb our analy-sis. We therefore merely amend our slip opinion at page 939, line 16 [244 F.2d 254.] by replacing the words "the trial" with "November 13, 1952."

As to allocating the 292 bales to the 148.5 tons on the Steel Artisan which were part of the 395 tons allegedly on consignment, see 134 F.Supp. 719, 762, we did not intend our opinion to require any particular allocation of this shipment, and specifically left that issue open. See slip opinion, page 939.

As to the final accounting, BIC misreads our opinion. We made no decision or allocation of any wools other than the 70 tons on the joint venture. We specifically left open the issue of whether the ultimate settlement agreement was for 150 tons at $1.25 or 120 tons at $115,000. of which only 80 tons were accepted. Thus, the inconsistencies alleged in the petition have no basis in our opinion.

As to the counter-claim, BIC has presented no persuasive reason why this issue should not be reconsidered by the district court in the light of all other findings. Admittedly, it is very unusual to treat the admission of a party as less than conclusive, but we see no reason why this should not be done as a matter of discretion in the extraordinary circumstance where justice requires it.

Petition for rehearing denied; opinion amended as indicated.